UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CYNTHIA G. PENNINGTON,

                                  Plaintiff,

v.

                                                             Case # 13-CV-6304-FPG

                                                             DECISION AND ORDER

CITY OF ROCHESTER, et al.,

                                  Defendants.

## INTRODUCTION

Plaintiff Cynthia G. Pennington brings this civil-rights action against Defendants City of Rochester, Lieutenant Eric Paul, and Deputy G. Wilczak.[1] ECF No. 1. Her claims arise from Paul and Wilczak's allegedly unlawful entry into her home in September 2012. Before the Court are Defendants' summary judgment motions. *See* ECF No. 69, 71, 72. For the following reasons, Defendants' motions are GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See*

---

[1] The Court previously dismissed the claims against Defendant County of Monroe. *See* ECF No. 59.

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

**BACKGROUND**

In 2012, Paul was a police officer employed by the City of Rochester. His daughter was the same age as, and was friends with, Pennington's son. Paul also interacted with Pennington's son through youth ice hockey.

In summer 2012, Paul learned through Pennington's son and other sources that Pennington was having mental health and alcohol abuse issues. Pennington's son relayed that these issues were also affecting his own mental health and had caused him depression. Pennington's son repeatedly ran away from home that summer. Because Pennington's son was close with Paul and his family, they interposed themselves in the conflict between Pennington and her son, attempting to mediate and resolve the situation.

The details of the conflict are immaterial for purposes of the present motion; it suffices to say that Pennington was upset by the fact that the Paul family had injected themselves into her family situation, and she disputes the truth of the rumors and information Paul heard.[2] Conversely, based on what he had learned about the conflict, Paul believed that Pennington's and her son's

---

[2] In her Rule 56 Statement, Pennington does not dispute that Paul heard about her alleged mental health and alcohol abuse issues; she only challenges them as hearsay. *See, e.g.*, ECF No. 78-2 ¶¶ 5, 16, 17, 18. However, these statements are not offered for the truth of the matter asserted—*i.e.*, that Pennington was in fact suffering from alcohol abuse or mental health issues—but only to prove the information available to Paul at the time of the relevant events. Therefore, they are not inadmissible as hearsay. *See Smith v. City of New York*, No. 14-CV-9069, 2016 WL 5793410, at *4 (S.D.N.Y. Sept. 30, 2016) ("A statement is admissible non-hearsay when it is offered as evidence of the effect of a statement on the listener, the knowledge motivating his actions, or his state of mind at the relevant point in time.").

respective mental states were so unstable that they might take their own lives.  *See* ECF No. 68-2 at 23.

On September 13, 2012 at 6:45 P.M., Paul began his shift.  At some point that evening, Paul's daughter had intended to meet with Pennington's son, but he never showed up.  When she texted Pennington's son, she received a "nasty" response accusing Paul and his wife of adultery and threatening to send more text messages.  ECF No. 68-2 at 37-38.  Paul's daughter and wife believed that Pennington had used her son's phone to send the message.  This belief was consistent with reports from Pennington's son and his hockey coach that Pennington had occasionally stayed up late at night, drinking alcohol and sending "erratic" emails to the hockey coach.  *See* ECF No. 78-2 ¶¶ 16, 17.  Paul's daughter and wife were concerned about Pennington's son's wellbeing.  Paul claims that he agreed to check on Pennington and her son to "see if they [were] okay."  ECF No. 68-2 at 38.

Paul notified a staff officer that he was "going off duty" to do a welfare check.  *Id.* at 40.  He also contacted the Sheriff's Department and arranged for a deputy, Wilczak, to accompany him to Pennington's home.  *Id.* at 42.  However, Pennington alleges that Paul's purpose was not to perform a mere welfare check on Pennington or her son, but to confront Pennington about the text message.  *See* ECF No. 78-3 ¶¶ 18-21.

Regardless, Paul and Wilczak arrived at Pennington's house sometime between 10:30 and 11:30 P.M.  *Id.* at 45.  They approached the front door of the house.  The outer screen door was locked and closed, but the inner door was swung open.  They knocked on the screen door, but there was no response.  Paul was able to see into an adjacent room and saw Pennington lying on the couch.  They also looked through a side window and observed Pennington.  They shined their flashlights on Pennington, continued to knock on the door, and yelled her name, but Pennington

3

did not move. ECF No. 68-2 at 50. Paul observed two cans of beer next to Pennington. *Id.* Paul observed that Pennington was "completely unresponsive," akin to someone suffering from alcohol poisoning or drug overdose. *Id.* at 53. Pennington counters that she was simply asleep. ECF No. 78-3 ¶ 23.

Paul went to a side door, which was unlocked, and entered the home. *Id.* at 47. Wilczak followed. Once inside, Paul approached Pennington, yelling her name, and grabbed her arm to rouse her awake. After a few seconds, Pennington woke up and yelled at Paul to get out of her house. Paul and Wilczak then left.

In June 2013, Pennington brought the present action. ECF No. 1. The surviving claims are as follows: (1) intentional infliction of emotional distress against Paul; (2) negligent infliction of emotional distress against Paul; (3) a § 1983 claim for unlawful entry against Paul and Wilczak[3]; (4) failure to train against the City of Rochester; (5) ratification of Paul's conduct against the City of Rochester; and (6) a *Monell* claim against the City of Rochester. *See* ECF Nos 1, 59.

**DISCUSSION**

Defendants move for summary judgment on all claims. The Court addresses each claim below.

1. <u>Intentional Infliction of Emotional Distress & Negligent Infliction of Emotional Distress Claims Against Paul</u>

Paul moves for summary judgment on the emotional-distress claims, arguing that his conduct was not sufficiently egregious to support those causes of action. *See* ECF No. 68-9 at 8-14. In her response, Pennington does not address Paul's arguments or even reference these claims.

---

[3] In her complaint, Pennington alleges that Paul violated her "civil rights" by "stalking" her. ECF No. 1 at 10. This claim seems to relate to an occasion where Paul drove to a campground at which Pennington and her family were staying. *Id.* at 4-5. Because Pennington does not describe any conduct even arguably constituting a constitutional violation, the Court will not address that aspect of her complaint.

4

*See generally* ECF No. 78. Accordingly, Pennington appears to have abandoned these claims, and summary judgment in Paul's favor is appropriate. *See, e.g.*, *L.W. Matteson, Inc. v. Sevenson Envtl. Servs., Inc.*, 831 F. Supp. 2d 608, 618 (W.D.N.Y. 2011) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

2. Claims against the City of Rochester

The City of Rochester moves for summary judgment on all of the claims against it. *See* ECF No. 71-5. Pennington filed no response challenging the City's motion. Accordingly, these claims are deemed abandoned, and the City's motion is granted. *See L.W. Matteson*, 831 F. Supp. 2d at 618.

3. § 1983 Claim against Paul and Wilczak

The only claim on which Pennington opposes summary judgment is the § 1983 claim against Paul and Wilczak. Paul and Wilczak argue that their actions were not unconstitutional and that they are entitled to qualified immunity. The Court agrees.

"To state a claim under Section 1983, a complaint must allege that the defendant (1) deprived the plaintiff of rights secured by the Constitution and laws of the United States, (2) while acting under color of state law." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 381 (S.D.N.Y. 2013). The right at issue here is the Fourth Amendment, which "protects individuals and their homes against unreasonable searches and seizures." *Id.* "Warrantless searches inside a home are presumptively unreasonable" under the Fourth Amendment. *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998).

"However, police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that

5

assistance." *Id.* (internal quotation marks and brackets omitted). "Courts must apply an objective standard to determine the reasonableness of the officer's belief." *Id.* "[T]his probable cause requirement must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 196-97 (internal quotation marks and brackets omitted).

Consistent with this standard, courts have routinely held that the emergency-aid exception applies where an officer enters a home to render assistance to an unconscious or unresponsive person. *See State v. Dist. Ct. of Eighth Judicial Dist.*, 577 P.2d 849, 852, 264 (Mont. 1978) (warrantless entry into apartment permissible where front door was ajar and officers observed a man "slumped over a table in the middle of the afternoon"); *State v. Heard*, 350 P.3d 1044, 1046 (Idaho 2015) (officers observed that occupant of hotel room was "initially unconscious and thereafter minimally responsive"); *State v. Neighbors*, 328 P.3d 1081, 1091-92 (Kan. 2014) (officers "knew an unresponsive male was seen lying on the couch [in the apartment] and could not be awakened by yelling or pounding on the front door"); *Harrison v. State*, 860 P.2d 1280, 1282, 1283 (Alaska Ct. App. 1993) (occupant of home was face down on kitchen table and did not respond to repeated knocking by police).

This case is not materially distinguishable from those above. Paul and Wilczak saw Pennington lying on her couch with alcohol nearby. She did not respond when the officers repeatedly knocked on the front door, shouted her name, and shined their flashlights at her. While a person falling asleep in front of the TV after a few beers may not, as a general matter, be a worrying or dangerous situation, it is more concerning if that person does not wake up or even stir when there is loud knocking and yelling occurring a few feet away. Moreover, the background context bolstered the reasonableness of the officers' reaction: Paul had heard from Pennington's

6

son and other sources that Pennington had mental health issues, abused alcohol, and had been engaging in erratic behavior in the preceding months. Indeed, that very day, Pennington had sent a harassing text message that was consistent with previous occasions in which she had purportedly abused alcohol and sent erratic messages to others. Faced with these circumstances, a reasonable officer could conclude that Pennington was unconscious or unresponsive, perhaps due to alcohol intoxication, and was in need of assistance.[4]

Even if there were a question as to whether the officers' belief was reasonable under the circumstances, the Court would conclude that qualified immunity applies. "The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). "To determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x 61, 62 (2d Cir. 2017) (summary order) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotation marks omitted). Courts "do not require a case directly on point before concluding that the law is clearly established, but

---

[4] Pennington's argument that the officers were motivated by an improper purpose is irrelevant. *See* ECF No. 78 at 3. It is well-established that an officer's "subjective motivation is irrelevant" in the Fourth Amendment context. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006). Thus, in *Stuart*, the Supreme Court found it irrelevant that officers may have been subjectively motivated to arrest rather to assist the injured when they entered a home without a warrant, where the officers " had an objectively reasonable basis for believing . . . that [an] injured adult [inside the home] might need help." *Id.* at 406; *see also Batt v. Buccilli*, 725 F. App'x 23, 25-26 (2d Cir. 2018) (summary order) ("The inquiry is not whether the officer subjectively believed that an occupant needed help.").

7

existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted).

Here, the Court cannot conclude that the constitutional question was "beyond debate" or that the officers were "plainly incompetent." To the contrary, the case law appears to permit this type of police action where a person is unresponsive, even if she is in her own home. While the cases the Court cited above are from state courts, the important point is that Pennington does not cite, and the Court's research has not revealed, any case in which a court found a constitutional violation under similar circumstances. *See* ECF No. 78 at 9-10. At most, Pennington cites cases where the emergency in question was more "obvious and overt." *Batt*, 725 F. App'x at 27; *see* ECF No. 78 at 8-9. But the fact "that the officers in [those] cases acted properly does not, by implication, 'clearly establish' that [Paul or Wilczak] acted *improperly*." *Id.* On this issue, the law is not clearly established, and the officers are therefore entitled to qualified immunity.

For both reasons, Defendants Paul and Wilczak are entitled to summary judgment on Pennington's § 1983 claim.

## CONCLUSION

For the reasons discussed above, Defendants' motions for summary judgment (ECF Nos. 69, 71, 72) are GRANTED. The complaint is DISMISSED WITH PREJUDICE. The Clerk of Court is directed to enter judgment and close the case.

IT IS SO ORDERED.

Dated: March 9, 2020
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

8